[No. 23419.   Department Two.   December 21, 1931.]

MARIE AORES, *Respondent,* v. GREAT NORTHERN RAILWAY COMPANY, *Appellant.*[1]

*Thomas Balmer, Charles S. Albert, Ernest E. Sargeant,* and *L. L. Iversen,* for appellant.

*Joseph A. Albi,* for respondent.

MILLARD, J.—Marie Aores, a pedestrian, was struck by a locomotive of the defendant at the intersection of Mission avenue and defendant's railroad tracks, in the city of Spokane.  Plaintiff instituted this action to recover for the personal injuries sustained as a result of that accident.  The trial court reduced by five hundred dollars the verdict returned in favor of the

[1]Reported in 6 P. (2d) 398.

plaintiff. From the judgment entered on the verdict as reduced, motions for judgment notwithstanding the verdict and for a new trial having been overruled, the defendant appealed.

Appellant insists that it was not negligent, and that respondent was negligent to such a degree as to require the court to hold, as a matter of law, that her right to a recovery was barred. It is respondent's position that appellant was negligent in raising the crossing gates prior to the passage of the northbound engine, stopping the ringing of the crossing bell before the gates were raised, backing the locomotive at an illegal rate of speed, and failing to give warning by bell or whistle of the approach of the engine on the east track.

While the testimony is sharply conflicting, the verdict is amply sustained by competent evidence. The determination of the jury forecloses the question of appellant's negligence as the proximate cause of the accident and the question of the contributory negligence (which the court correctly submitted to the jury) of the respondent. The facts are summarized as follows:

About five-thirty p. m., May 17, 1930, the respondent and a girl companion were walking westward on the south sidewalk of Mission avenue. The course of appellant's double tracks, which intersect Mission avenue at right angles, is north and south. The first track one crosses if walking west through this intersection we will designate as the east track. Parallel thereto and immediately west thereof is a second railroad track, which we will term the west track.

The crossing in the case at bar is a guarded railroad crossing, hence the rule that a pedestrian must look and listen for approaching trains before attempting to cross tracks intersecting a public sidewalk, and

must do so at a time and place and in a manner that will be effective, does not apply in all its strictness. 33 Cyc. 946; *Ray v. Hines,* 118 Wash. 530, 203 Pac. 929; *Kasky v. Baltimore & O. R. R. Co.,* 23 Ohio App. 185, 155 N. E. 174. East and west of the crossing the appellant maintains gates or bars, which are electrically operated from a tower west of the double tracks and south of the south sidewalk, across the street and across the sidewalk, to warn and guard the public against attempting to cross while trains are within and crossing the intersection.

Respondent and her companion stopped at a distance of four to six feet east of the gate in front of them to wait for a freight train proceeding south on the west track to clear the crossing. The gates were down, and the crossing bell on the tower from which the gates were controlled was ringing its warning to the public not to attempt to cross the tracks.

The gate in front of the respondent was approximately eight and one-fourth feet east of the east rail of the east track. Respondent's view to the south was obstructed. Nine feet to respondent's left, or south of the sidewalk, a woven wire fence seven feet in height, nine and one-half feet east of the east rail of the east track and parallel therewith, extended southerly for a long distance. A wing or "L" fence extended west from the north post (which was nine feet south of the south sidewalk) of the parallel fence towards the east track a distance of from two and one-fourth to two and three-fourths feet. The west post of this wing fence was approximately six and one-third feet east of the point where the engine overhangs the east rail of the east track.

Shrubbery, vines and trees, east of and alongside the parallel fence, hid the east side of the fence from view. Also, at the time of the accident, the wing fence

seven feet in height was covered with vines and foliage which concealed it from view. That is, until one on the south sidewalk walking west was six and one-third feet east of the point where the engine and cars overhang the east rail of the east track, such pedestrian could not see a train approaching from the south at a greater distance than twenty-four feet.

When the caboose or rear of the freight train proceeding south on the west track was just about to clear the sidewalk (the south sidewalk extended west across the tracks) on which the respondent and her companion were standing awaiting the raising of the gates, the towerman stopped ringing the bell on his tower and raised all the gates as high as they could be elevated. From his position in the tower, the towerman was enabled to observe approaching trains in time to close the gates against vehicles and pedestrians seeking to cross the tracks.

As soon as the gates were raised, the respondent and her companion entered the intersection. Respondent testified that she looked to the south and to the north as she was walking at a normal gait towards the tracks. Appellant insists that she looked when at a point she could not see the approaching engine, and did not look for the train when she was in a place where she could have seen the approaching engine, hence was guilty of contributory negligence. Respondent did not, nor did her companion, see or hear anything to warn them of danger.

About this time, the towerman discovered a northbound engine (south of the south sidewalk) on the first or east track backing up at a speed of ten miles in excess of the legal speed and without giving any warning of its approach. The towerman lowered the gates and began to ring the warning tower bell. That warning was too late, however, to save respondent, who was

struck, after having taken four or five steps, by the northeast corner of the engine and severely injured.

Respondent could not have seen an engine to the south at a greater distance than twenty-four feet. She was walking at a speed not to exceed four and four-tenths feet a second. The engine was traveling nearly forty-four feet a second. Relying, as she had a right to do, upon the invitation to enter the intersection, the respondent attempted to negotiate the crossing and was trapped. The respondent would consume about one and one-half seconds in traveling from the west end of the wing fence, where she could see not to exceed twenty-four feet to the south, to the point where she was struck by the engine. During the period of time she was traveling six and one-third feet, the engine would have traveled sixty-six feet; that is, the engine was not less than forty-two feet south of the first point at which the engine would come within respondent's range of vision.

Whether the respondent exercised the care that an ordinarily careful and prudent person would exercise under the same conditions, was a question for the jury; and they were so instructed. She had a right to assume that the appellant's trains would not attempt to cross the intersection against the traffic signal. There was no duty imposed upon her of doing other than proceeding across the tracks, when the gates were raised and the tower bell stopped ringing, presuming that the northbound and southbound engines and trains of the appellant would not interfere with her progress.

The respondent awaited at a guarded railroad crossing for appellant's permission to enter upon the tracks. The view of the approaching engine was obstructed. An engine approaching from the south at an illegal rate of speed, and its occupants giving no warning of the engine's approach, was within the range

of vision of the towerman. Not seeing that north-bound engine—it was his duty to see it—the towerman raised the gates, and thereby assured the respondent it was safe for her to cross the tracks. Almost coincident in time with the moment she was struck, the towerman discovered the northbound engine. The warning —ringing of the bell in the tower—then given by the towerman was too late to protect respondent.

"The public have a right, when the gates are open, or the flagman not in his accustomed place of duty, to presume, in the absence of knowledge to the contrary, that the gateman or flagman is properly discharging his duties, and it is negligence for a gatekeeper or flagman to leave his post, knowing that an engine is approaching, without giving some signal of danger. If the flagman or watchman neglects to give any warning, or does not give a warning until the traveler is in great danger, especially where the view of the approaching train is obstructed, and no signals are given by it, the railroad company is responsible. Where gates are established, although there is no statute requiring their maintenance, it is negligence if they are not constructed, attended, and maintained, with ordinary care and prudence, so as to give the proper warning of an approaching train, or so as not to injure a passer-by by the manner in which they are maintained or closed. Likewise it is negligence to leave them open when trains or cars are passing, except as to one who sees the train going in front of him, and the mere fact that the flagman signaled the person injured not to cross does not free the railroad company from negligence, unless such signal is given in time for such person by the exercise of reasonable care to avoid the injury." 33 Cyc. 946.

The foregoing rule is applicable to the facts in the case at bar, and was quoted with approval in *Ray v. Hines,* 118 Wash. 530, 203 Pac. 929. We there said:

"Whether the flagman be stationed at the crossing, or the custom be established of giving a warning by the men in charge of the movement of trains across

the street, the result is the same. In either case the public is led to expect the warning if there be imminent danger, and the failure to give the customary warning tends to mislead and deceive. In fact, such failure becomes in effect a trap.

"There are not wanting cases which hold that the traveler cannot entirely rely upon signals and the performance of duty by a flagman, but must also seek to safeguard himself by the use of his faculties and other means at hand. (Citing cases.)

"While we agree that the failure of the flagman to give the customary warning does not warrant the traveler in rushing into a danger that is open and apparent to him, yet we cannot go to the extent of holding that, in the absence of such apparent danger, he may not rely upon the failure to give the customary signal and proceed without that degree of care which would be required at an unflagged crossing, without being guilty of contributory negligence as a matter of law. When the facts upon which they are based are carefully analyzed and considered, it will be found that a goodly portion of the cases just cited go no further than this, and we think that the following authorities clearly support our view: (Citing cases.)

"The evidence justifying the finding made by the jury that the customary signal was on this occasion omitted, sustains the charge of negligence on the part of the appellant and precludes a holding that respondent was guilty of contributory negligence as a matter of law."

Respondent had a right to assume that the duty imposed upon appellant by the installation and maintenance of the safety gates would be performed. When those gates were open she was thereby granted permission, invited, to cross the tracks, and also assured that the crossing could be made with safety. The rule that a pedestrian must look and listen for approaching trains before crossing tracks intersecting a public sidewalk, and must do so at a time and place and in a manner that will be effective, does not apply in all its

strictness to a guarded railroad crossing. A case in point is *Kasky v. Baltimore & O. R. Co.*, 23 Ohio App. 185, 155 N. E. 174, in which the court said:

"The trial court in passing upon this motion, applied the law which has been long established: That a person upon a public street, when approaching a steam railroad grade crossing, must look and listen for the approach of trains before crossing, and must do so at a time and place and in a manner that will be effective; also, that an injured pedestrian cannot claim to have looked and listened, when, if he had, the same would have been effective and would have prevented the accident. So, the question we have to decide is whether this rule applies in all its strictness to a city crossing which is guarded by safety gates and a railroad watchman, when the gates are open and the watchman is negligent in the discharge of his duties, and a pedestrian is injured by being hit by a train of the railroad company at said crossing.

"The evidence in this case shows that the defendant was guilty of passive negligence in failing to ring its bell or give other notice to the plaintiff of the approach of the train, and it was also guilty of such conduct as would amount to an assurance of safety to the plaintiff and a direct and affirmative invitation to her to use the crossing, notwithstanding the train was then approaching. While this situation does not relieve the plaintiff of her duty to use ordinary and reasonable care for her own safety, it does materially affect the question of contributory negligence.

"This question has been frequently before the courts of the several states and the United States Supreme Court, and almost without exception it has been held that facts similar to the ones disclosed by the record in this case present a question of fact to be determined by the jury, and that a trial court is incompetent to pass upon the same.

"There is no doubt that the plaintiff was required to exercise ordinary care, and the test is what an ordinarily careful and prudent person upon a public street is accustomed to do in the presence of facts similar to the ones in the instant case, and this pre-

sents an entirely different situation from what an ordinarily careful and prudent person would do and the law would require him to do, if he were approaching a railroad crossing at grade at which no gates had been installed and no watchman was present. The plaintiff had full knowledge of the existence of the safety gates and that they were used in times of danger, as a warning to the public not to go upon the tracks, and she and others had a right to assume that the duty cast upon the defendant by the installation of the gates would be performed, and she was under no obligation to anticipate that the defendant would be negligent in the discharge of those duties. The very purpose of the safety gates was to give warning in times of danger. When they are open, they are a token of safety, and, when closed, an evidence of danger. The open gates would signify to a man of prudence that no danger was present, and he would be confirmed in that belief by seeing the watchman standing near and giving no warning sign of danger.''

Under the heading ''Obstructed View,'' appellant contends the court erred in giving two instructions and in refusing to give to the jury five of appellant's requested instructions.

The two instructions, given as follows, fully stated the legal questions involved, carefully guarded all the rights of the appellant, and are in harmony with the rule enunciated in *Ray v. Hines,* 118 Wash. 530, 203 Pac. 929:

''INSTRUCTION No. 10. You are instructed that where gates are established by a railroad company at grade crossings, it is negligence if they are not maintained, attended and operated with ordinary care and prudence, so as to give the proper warnings of an approaching train, engine or railway car, or so as not to injure a passer-by, by the manner in which they are operated. You are further instructed that to open such gates when trains or cars are about to pass the crossing, which fact the gatekeeper knew, or with reasonable care should have known, is negligence, for which the railroad company would be responsible, except as to

one who sees the train, or cars, approaching, or who, in the exercise of reasonable care for his own safety, should have seen them; and so in this case if you find that the gate keeper was negligent in doing, or failing to do any of the things above enumerated, and that such negligence was the proximate cause of the accident, the plaintiff would be entitled to a verdict against the defendant, unless you should further find that she did not exercise reasonable care, such as a reasonably prudent person under all the circumstances then existing would have exercised; or in other words, unless you find that she, herself, was guilty of contributory negligence, as that term has been defined to you, and in that event your verdict would be for the defendant.

"INSTRUCTION No. 11. You are instructed that the raising, or opening of the gates, at a guarded railroad crossing is an implied invitation for the waiting public to cross, and is an implied assurance by the railroad company that the public can cross without danger of being struck by on-coming engines or trains, and a person using such crossing at such a time has a right to rely on such invitation and assurance. However, the existence of such gates at a crossing would not make the railroad company an insurer of the plaintiff's safety. In this case if you find from the evidence that the gate was raised, you are instructed that it was the duty of the plaintiff to make use of her sense of sight, hearing and such other factors of safety as the situation and circumstances permitted and required, of one intent on his own safety. That is, the duty rested on the plaintiff at all times to exercise ordinary and reasonable care, such as an ordinarily prudent person would have exercised under the same or similar circumstances. The fact that gates are maintained at this crossing does not cast upon the defendant the duty to make the place of accident absolutely safe, but it must exercise ordinary care and operate such gates in a prudent manner so as not to endanger a traveler upon the highway."

The trial court did not commit error in refusing to give appellant's requested instructions, all of which

fail to consider the fact that the place may have been a guarded railroad crossing, on which respondent could rely that it would be safe to cross upon invitation of the appellant.

One of the instructions would require the respondent to listen effectively; that is, in such a manner as to hear the engine, regardless of whether a reasonably prudent person would have heard the engine under the same circumstances. Another instruction imposes, contrary to the rule discussed above, the duty upon one desiring to cross the tracks to ascertain that the track is clear, when an invitation is extended by another in a position to know and whose duty it is to know that the track is clear. A third of the requested instructions imposes the absolute duty upon the respondent to look south while taking a last step towards the overhang of the engine, and fails to take into consideration the invitation of the towerman to cross the tracks and his assurance that the way was clear.

Another requested instruction is contrary to the rule applicable to the facts in the case at bar, and is defective in that it omits the statement that, assuming the respondent was negligent, such negligence must have been a proximate cause of her injuries to bar her right to a recovery.

We have considered all of the other assignments of error, which we find are without substantial merit.

The judgment is affirmed.

TOLMAN, C. J., MAIN, HOLCOMB, and BEALS, JJ., concur.